**UNITED STATES of America,**
**Plaintiff-Appellant,**

v.

**Stephen A. GONSALVES,**
**Defendant-Appellee.**

**No. 80–1860.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 3, 1981.

Decided Nov. 9, 1982.

Lamond R. Mills, U.S. Atty., Las Vegas, Nev., for plaintiff-appellant.

Richard P. Crane, Jr., Los Angeles, Cal., for defendant-appellee.

Before ELY and NORRIS, Circuit Judges, and PECKHAM,* District Judge.

PECKHAM, District Judge:

The Government appeals from the District Court's order of December 17, 1980, granting the motion to dismiss the indictment on behalf of appellee-defendant Stephen Anthony Gonsalves. Appellee had been charged along with twelve other defendants and seventeen unindicted co-conspirators for violation 21 U.S.C. § 963, Conspiracy to Import a Controlled Substance, and 21 U.S.C. § 846, Conspiracy to Possess with Intent to Distribute a Controlled Substance. Gonsalves' alleged role was to act as a money courier in one of the numerous financial transactions that took place during the course of the charged conspiracy.

Four years earlier, the District Court had ordered a judgment of acquittal in favor of three of appellee's co-conspirators who had been brought to trial on the same indictment. Gonsalves had not been arrested as of that time. However, on August 28, 1980, he surrendered to the United States Magistrate in Las Vegas, Nevada. On September 26, 1980, he filed a motion to dismiss the indictment on the same grounds that had supported the previous judgment of acquittal in favor of three of his alleged co-conspirators.

---

* Honorable Robert F. Peckham, Chief United States District Judge, Northern District of California, sitting by designation.

1. We emphasize that none of these charges have been established by evidence. Upon review of an order dismissing an indictment,

The District Court, relying on its inherent supervisory power to prevent undue interference with the effective administration of justice, granted the motion on the grounds that, *inter alia,* the indictment was an "unmanageable monstrosity." Under the particular facts of this case, and for the reasons set forth below, we affirm the District Court's order of dismissal pursuant to its proper exercise of supervisory power.

I. FACTS

■ The Government has alleged an elaborate on-going conspiracy to import and distribute a controlled substance during the period of January 1, 1973, to June 18, 1974. The two-count indictment names a total of thirteen defendants, Gonsalves among them, as well as seventeen co-conspirators who were not named as defendants. According to the Government, these individuals were engaged in a conspiracy to import and distribute hashish purchased from England, the Netherlands, and other countries in Europe and the Middle East. The Government alleges that the following scenario took place.[1]

In February of 1973, Ernest Franz Combs contacted James Earl Gater in South Lake Tahoe, California. Combs told Gater that, with the help of James Morris and others, he was going to smuggle hashish from Europe into the United States. In particular, Morris was to get some acoustical sound speaker cabinets specially manufactured so that fiberglass sections filled with hashish could be fit into them. After the cabinets were manufactured in England, they were shipped to France where they were picked up by Robert David Work, among others, and then loaded with hashish.

Morris shipped the hashish-filled speaker cabinets from Paris, France, to New York City on March 4, 1973. From there they were shipped to Los Angeles. Gater was to

however, the indictment must be tested by its sufficiency to charge an offense. *United States v. Sampson,* 371 U.S. 75, 78 79, 83 S.Ct. 173, 174–175, 9 L.Ed.2d 136 (1962). We must, therefore, accept all of the Government's allegations as true for the purposes of this appeal.

meet Richard Kenneth Brown at the Orange County Airport in California and then proceed to a warehouse in San Pedro, California, where the cabinets were to be delivered and unloaded. Brown had given Gater a carnet which he was to show to the customs officials at Trans World Airlines (TWA) Air Cargo at the Los Angeles International Airport in order to pick up the cabinets.

On March 8, 1973, Gater picked up the hashish-filled sound speaker cabinets at the Los Angeles airport in a rented U-Haul truck and transported them to the warehouse in San Pedro where Gater, Brown, and Work unloaded 724 pounds of hashish. After unloading the cabinets, Brown gave Gater a kilo of hashish as compensation for picking up the equipment. Furthermore, because Gater had been involved in the operation, Combs told him that, if he desired, he could invest between twenty and thirty thousand dollars on the next shipment and receive a share of the proceeds.

In early March of 1973, Combs again contacted Gater and instructed him to go to Austria and rent a house that would be used to collect the hashish. Combs agreed to allow Gater to invest $20,000.00 in this venture. Combs told Gater that Robert Carl Fry was to receive $50,000.00 to assist Gater in Austria. Combs also explained that Gater was to fly to Graz, Austria, and meet with Salim Inard Hraoui.

On March 12, 1973, Gater flew from South Lake Tahoe to the Orange County Airport where he was picked up by Brown. They went to Brown's house where Gater was given approximately $300,000.00 in cash to take with him to Graz. In Graz, Gater met with Karl Ferdinand Krug who assisted him in finding a house to rent. After renting the house, Fry arrived and Gater gave him the $300,000.00 which he was to use to purchase the hashish. Thereafter, the hashish was purchased and was brought to the house for packing in the sound speaker cabinets. During this period, Combs persuaded Gary Lynn Lickert to rent a U-Haul truck and drive to San Pedro. Lickert loaded ten speaker cabinets on the truck and delivered them to TWA air freight to be sent to London, England.

The ten cabinets, along with other pieces of equipment, were shipped by Raymond Barry Mayo from London to Austria. Mayo then traveled to Austria where he and Hraoui picked up the equipment and delivered it to the house that Gater had rented. Gater, Fry, Mayo, and Hraoui then loaded the ten sound speaker cabinets with hashish and shipped them from Austria to Philadelphia, Pennsylvania.

After this transaction, Fry had $120,-000.00 left out of the $300,000.00 sent by Combs to Austria to purchase hashish. Fry gave the remaining money to Gater. The Government claims that appellee Gonsalves instructed Gater to give the money to Kent Giles Snyder.

After the cabinets had been shipped, Gater went back to the United States where he met up with Snyder, Morris, and Kenneth Graham Plinston. Upon arrival in the United States, Gater went first to Brown's house and then to Combs's house. Gater was paid $25,000.00 for his share of this deal from Snyder.

In the latter part of May 1973, Combs asked Harold Adrian Armstrong to take $140,000.00 in cash to London. Combs instructed Armstrong to purchase a special suitcase to carry the money. Gonsalves delivered the $140,000.00 in cash to Armstrong which was to be given to Plinston in London. After delivering the money, Armstrong returned to the United States.

At the end of June 1973, Gater was again instructed to go to Austria to consummate another hashish deal. Accordingly, Gater and Brenda Marie Sibson went to an apartment in Newport Beach where they were met by Brown and Combs. There, Combs gave $260,000.00 cash to Gater to take to Austria.

On July 3, 1973, Klaus Warner met Gater and Sibson in Graz, Austria. Warner gave Gater the keys to a vehicle containing 140 kilograms of hashish, whereupon Gater paid Warner $50,000.00 cash. Gater, Sibson, and Mayo then loaded 420 kilograms of hashish

in fiberglass inserts which were placed inside twelve acoustical sound speaker cabinets.

A few days later, Mayo shipped twenty-three pieces of sound equipment, including the twelve speaker cabinets, to Chicago, Illinois, and retrieved the shipment there on July 18. Mayo then shipped the speakers to Las Vegas.

On August 21, 1973, Gater, Sibson, Mayo, and Richard Jonathan Vickers loaded 500 pounds of hashish into sound speaker cabinets in Italy. Thereafter, Vickers and Mayo shipped thirty-four pieces of sound equipment, including the speaker cabinets, to San Francisco. Morris received the shipment at the San Francisco International Airport. On August 31, Combs had Lickert take $297,000.00 in cash to Amsterdam, Holland, and deliver the money to Gater and Dennis Howard Marks.

In early September 1973, Gater, Marks, and others packed 820 pounds of hashish into sixteen sound speaker cabinets. That same day, Allen Richard White shipped twenty-nine pieces of sound equipment, including the sixteen sound speaker cabinets, from Holland to Detroit, Michigan. Instead of being sent to Detroit, however, the cabinets were sent through New York to Las Vegas. It was at this point that the Government began its investigation. On September 13, 1973, a United States Customs dog at John F. Kennedy Airport in New York reacted to an odor being emitted from a large wooden chassis of one of the sound speaker cabinets. United States Customs Inspectors opened the speaker cabinet and found sixty pounds of hashish in the chassis of the speaker. An investigation determined that the speaker cabinet they discovered was one of the twenty-nine pieces of freight destined for Las Vegas.

Investigation further disclosed that the remaining twenty-eight pieces were on a TWA flight which was to arrive in Las Vegas on September 13, 1973, at 12:37 p.m.

The shipment of the twenty-eight pieces had originated in Amsterdam and arrived at JFK International in bond shipment. The shipment was consigned to D & N Delivery Corporation, McCarran International Airport, Las Vegas, for delivery to Trans Atlantic Sound, Las Vegas. Special Agent Fowler of the Drug Enforcement Administration (DEA) in New York notified the Special Agent in charge at Las Vegas of these events. Special Agent Harlan Bowe arrived at TWA freight at McCarran International on the afternoon of September 13, 1973. Bowe, other DEA agents, and a United States Customs Agent were directed to a TWA agent who in turn directed the Customs agents to a Pan Am air freight transportation crate. The crate contained the twenty-eight pieces of freight. The freight consisted of fifteen large wooden chassis containing speakers, six wood frame chassis with a fiberglass coating, two musical instrument cases, and five metal trunks. A U.S. Customs Supervisory Inspector advised the agents that shipment was still in U.S. Customs bond. The freight was removed from the Pan Am crate and placed in a TWA and United Airlines storage area.

Later that day, DEA agents opened a side panel to one of the large speaker chassis. They found a fiberglass container secreted in the compartment of the speaker. Inside the container, they found individual packages containing hashish. The speakers were repacked and the agents waited for them to be picked up. The next day, Lickert went to D & N Delivery Corporation and picked up the shipment. The agents trailed Lickert briefly and then stopped his car and arrested him. Lickert was indicted on September 27, 1973, by a federal grand jury in Las Vegas. He was charged with violation of 21 U.S.C. § 841(a)(1).[2] On October 4, 1973, a superseding indictment was returned charging Lickert with the same offense. After a jury trial, he was found guilty.

---

2. 21 U.S.C. § 841.

(a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance;

. . . .

As a result of the information supplied by Lickert and others, along with further investigation by the DEA, a second federal grand jury in Las Vegas returned a three-count indictment on December 5, 1975, naming Gonsalves and fifteen other co-defendants. Count I of the indictment alleged ninety-three separate overt acts in furtherance of an elaborate drug conspiracy. Counts II and III relied upon an alternative theory of aiding and abetting the drug importation and possession.

The District Court was able to acquire jurisdiction only over defendants Richard Kenneth Brown, Robert David Work, and Kent Giles Snyder.[3] On February 11, 1976, the District Court granted the Government's motion to dismiss Counts II and III of the indictment pursuant to rule 48(a), Fed.R.Crim.P.[4] Thereafter, the three defendants moved to dismiss the remaining count on the ground that it impermissibly charged two separate conspiracies in violation of rule 8(a), Fed.R.Crim.P.[5] The District Court agreed and dismissed the indictment on that basis. Moreover, the court set forth specific concerns it held regarding the allegations in Count I and their complexities:

> Count I of the indictment now dismissed names 16 defendants. Ten of the defendants are citizens of other countries and not amenable to the process of this Court and, according to the Government, there is no way in which they can be compelled to appear before this Court pursuant to treaty between the United States and the countries of which they are citizens. Of the 6 defendants that are citizens of the United States, only 3

are before this Court, the other 3 are fugitives and the Government cannot assure the Court as to whether or not pending bench warrants will ever be served upon them. The indictment names some 14 co-conspirators who are not defendants and alleges 93 separate overt acts alleged to have taken place in the United States and many foreign countries.

Rule 7(c)(1) of the Federal Rules of Criminal Procedure reads:

> "The indictment or the information shall be a plain, concise and definite written statement of the essential facts constituting the offense charged."

The Court hopes that in representing the matter to the Grand Jury United States Attorney Lawrence Semenza will make some effort at least to comply with the requirements of Rule 7(c)(1) and, in addition, to give the Court a case that is manageable for trial. Count I of the indictment now dismissed is, to say the least, a monstrosity.

Subsequent to the dismissal of the original indictment, the grand jury returned the present two-count indictment, Cr. LV 76–39, on March 25, 1976, charging appellee Gonsalves, among others, with violations of 21 U.S.C. § 846, Conspiracy to Possess with Intent to Distribute a Controlled Substance, and 21 U.S.C. § 963, Conspiracy to Import a Controlled Substance. As this was a superseding indictment, the District Court allowed all motions and responsive pleadings filed in Cr. LV 75–198 to be filed in Cr. LV 76–39.

The jury was empaneled on September 20, 1976, and the Government and attorneys

---

**3.** The main conspirators, Ernest Franz Combs, James Morris, and Kenneth Graham Plinston, were not before the court. Morris and Plinston are residents of foreign countries, while Combs apparently remains a fugitive.

**4.** Fed.R.Crim.P., Rule 48. Dismissal
 (a) By Attorney for Government. The Attorney General or the United States attorney may by leave of court file a dismissal of an indictment, information or complaint and the prosecution shall thereupon terminate. Such a dismissal may not be filed during the trial without the consent of the defendant.

**5.** Fed.R.Crim.P., Rule 8. Joinder of Offenses and of Defendants
 (a) Joinder of Offenses. Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

for defendants Brown, Work, and Snyder each made their opening statements. The following day, the court granted a Rule 29(a) motion for judgment of acquittal as to each of the three defendants. The order of judgment of acquittal stated simply that it was based upon the Government's trial memorandum and opening statement. The transcript, however, informs us that the trial judge was concerned with at least three related problems raised by the indictment. (1) The indictment impermissibly alleged separate multiple conspiracies as a single conspiracy. (2) Viewed as multiple conspiracies, the District Court for the district of Nevada lacked jurisdiction to try the offenses as alleged with respect to the three defendants because of lack of contact with Nevada. (3) The indictment encompassed an "unmanageable monstrosity" of proof and events so as to interfere unduly with the effective administration of justice and to require dismissal under the "supervisory powers" of the District Court. The transcript makes clear, however, that the court rested its decision primarily on the unmanageable nature of the indictment and not on the issue of jurisdiction.[6]

The Government appealed the District Court's granting of the Rule 29(a) motion on October 1, 1976. Another panel of this court dismissed that appeal on May 4, 1977, based on the fact that jeopardy had attached. On July 11, 1977, the Government filed a petition for an out of time rehearing and a motion to recall the mandate which had previously issued. These requests were denied by the panel citing the substantial delay and the failure of the Government to present adequate justification for the delay.

On August 28, 1980, appellee Gonsalves surrendered to the United States Magistrate in Las Vegas and was released on bond. The matter was set for trial on the same two-count indictment which was the subject of the previous judgment of acquittal for defendants Brown, Work, and Snyder. Subsequently, appellee moved to dismiss the indictment for the reasons articulated by the District Court as its basis for granting the previous judgment of acquittal, *i.e.*, the allegation of multiple conspiracies on the face of the indictment, lack of jurisdiction, and unmanageability. Appellee also filed without objection a supplemental memorandum of points and authorities which set forth for review by the District Court the signed statements of the three predominant Government witnesses. These statements, which were voluminous, purportedly supported appellee's previously stated three grounds for dismissal.

On December 17, 1980, the District Court, exercising what it labeled its "discretionary supervisory powers," dismissed the indictment. The following day the Government filed its notice of appeal. Our task is to determine whether the dismissal of the indictment was a proper exercise of supervisory power by the District Court.

## II. SUPERVISORY POWER

Supervisory power first appeared as an independent basis of decision in the federal judiciary in *McNabb v. United States,* 318 U.S. 332, 340–47, 63 S.Ct. 608, 612–616, 87 L.Ed. 819 (1943). In *McNabb,* the Supreme Court, relying on the authority of its supervisory power over the administration of the criminal justice system, excluded relevant evidence from a federal criminal prosecution because federal police and investigators had obtained it illegally. The Court described its supervisory authority over federal courts as a basis of decision resting neither on constitutional nor on statutory grounds. Since then "supervisory power" has been used to cover a broad range of judicial actions and has been exercised by all three levels of the federal judiciary for the purposes of (1) formulating new rules of fairness of general application, (2) enforcing judicial compliance with already existing standards of fairness, and (3) avoiding a miscarriage of justice in particular cases where already existing procedures

---

6. The court stated that the question was "quite apart from jurisdiction." Assuming all of the overt acts occurred in Nevada, the court reasoned, the court's inherent authority allowed it to step in "to the extent it is necessary to bring order out of chaos." *See* Excerpt of Record at 63–64.

have proved inadequate. *See* Note, *The Judge-Made Supervisory Power of the Federal Courts,* 53 Geo.L.J. 1050 (1965). From the outset, notions of fair play which are more exacting than the minimum constitutional requirements of due process have been the primary moving force behind the exercise of judicial supervisory power. The doctrine is now commonly invoked to refer generally to the court's inherent power to preserve the integrity of the judicial process.

The "tainted evidence" doctrine remains perhaps the most well-known rule of law which traces its origin to the Supreme Court's supervisory power. *McNabb, supra,* 318 U.S. at 341, 63 S.Ct. at 613. *See United States v. Payner,* 447 U.S. 727, 744, 100 S.Ct. 2439, 2450, 65 L.Ed.2d 468 (1980). Courts also use their supervisory power to exclude unreliable evidence from trial. *Mesarosh v. United States,* 352 U.S. 1, 77 S.Ct. 1, 1 L.Ed.2d 1 (1956); *Communist Party of the United States v. Subversive Activities Control Board,* 351 U.S. 115, 124, 76 S.Ct. 663, 667, 100 L.Ed. 1003 (1956). In addition, the supervisory power has been used to impose upon prosecutors the duty in certain cases to make available to a defendant information from their files. *Jencks v. United States,* 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957).

The inherent supervisory authority of federal courts has been used to do justice in particular fact situations that do not lend themselves to rules of general application. For example, in *Grunewald v. United States,* 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), the defendant refused to testify before a grand jury, invoking the fifth amendment privilege against self-incrimination. However, he later testified on the same subject-matter at his trial. Cross-examination by the prosecutor revealed the plaintiff's earlier refusal, but the Supreme Court held the permitting of such cross-examination to be reversible error. The majority held that "under the circumstances of this case" the possibility of prejudice was great enough to warrant the Court's invocation of its supervisory power. *See also Marshall v. United States,* 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959) (exercise of supervisory power to protect against prejudice turns on facts of each case); Note, *The Supervisory Power of the Federal Courts,* 76 Harv.L.Rev. 1656, 1659 (1963).

In recent years, the Ninth Circuit has affirmed its willingness to utilize its supervisory powers to review the dismissal of an indictment by a trial court when necessary "to protect the integrity of the judicial process." *United States v. Chanen,* 549 F.2d 1306, 1309 (9th Cir.), *cert. denied,* 434 U.S. 825, 98 S.Ct. 72, 54 L.Ed.2d 83 (1977), quoting *United States v. Leibowitz,* 420 F.2d 39, 42 (2d Cir. 1969). While such dismissals have been based occasionally on constitutional grounds, *United States v. Basurto,* 497 F.2d 781 (9th Cir. 1974), more often we have invoked our inherent supervisory power, *United States v. Owen,* 580 F.2d 365 (9th Cir. 1978), *United States v. Samango,* 607 F.2d 877 (9th Cir. 1979). Indeed, over twenty years ago this court stated that a trial court may have legal discretion to dismiss an indictment "to do justice," even in the absence of express statutory authority. *United States v. Apex Distributing Co.,* 270 F.2d 747, 756 (9th Cir. 1959).[7] *See also United States v. De Diego,* 511 F.2d 818, 824 n. 8 (D.C.Cir.1975). In the realization that the dismissal of an indictment by a trial court may encroach on the prosecutor's prerogatives, however, this court has further held that the trial court may not exercise such "supervisory power" unless there is "a clear basis in fact and law for doing so." *Chanen, supra,* 549 F.2d at 1313.

7. *United States v. Apex Distributing Co., supra,* involved a Government refusal to comply with subpoenas duces tecum and court orders requiring it to produce certain materials before a criminal trial. The District Court responded by ordering a dismissal with prejudice. On review, the appellate panel agreed that the United States had essentially caused an "unnecessary delay" in bringing appellees to trial. Accordingly, the circuit court held that the trial court could have properly invoked its power to dismiss under rule 48(b), Federal Rules of Criminal Procedure. Alternatively, the trial court "may simply have purported to act in the exercise of its inherent power to do justice." 270 F.2d at 755-56.

Reliance upon this court's supervisory power with respect to dismissals can be seen clearly in cases involving prosecutorial misconduct in securing indictments. In *United States v. Basurto, supra,* a panel of this court held that the defendants' right to due process was violated where they had to stand trial on an indictment which the Government knew was based in part on perjured testimony. It was stated that permitting trial on such an indictment failed to comport with the required "fastidious regard for the honor of the administration of justice." *Id.* at 787, quoting *Communist Party v. Subversive Activities Control Bd., supra,* 351 U.S. at 124, 76 S.Ct. at 667 (1956). In a special concurrence, Judge Hufstedler accepted the result reached by the majority, but declined to rely upon a constitutional theory as the basis for the decision. Instead, she relied upon "our power to supervise the administration of criminal justice in the federal courts." *Basurto, supra,* 497 F.2d at 793. "An important function of our supervisory power is to guarantee that federal prosecutors act with due regard for the integrity of the administration of justice." *Id.*

Subsequent to Judge Hufstedler's concurrence, this court has supported the reasoning set forth therein in a number of cases involving prosecutorial misconduct. In *United States v. Owen,* 580 F.2d 365, 367 (9th Cir. 1978), for example, we explicitly held that, pursuant to its inherent supervisory power, a federal court is empowered to dismiss an indictment on the basis of governmental misconduct. "As such, dismissal is used as a prophylactic tool for discouraging future deliberate governmental impro-

priety of a similar nature." *Id.,* citing *Elkins v. United States,* 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669 (1960) and *United States v. Houghton,* 554 F.2d 1219, 1224 (1st Cir. 1977), *cert. denied,* 434 U.S. 851, 98 S.Ct. 164, 54 L.Ed.2d 120 (1977).

In this case, however, prosecutorial misconduct cannot form the basis for upholding the District Court's dismissal. Although the motives of the United States Attorney have been questioned by the trial judge in this case,[8] no allegation of prosecutorial misconduct as such has been presented.[9] Rather, the District Court focused on the sheer unmanageable complexity of the indictment in invoking its supervisory powers.

As we discussed above, however, the inherent supervisory power of the federal courts may be invoked to do justice in particular fact situations. *See United States v. Samango, supra,* 607 F.2d at 884; Note, *The Supervisory Power of the Federal Courts, supra.* But the decision of whether to exercise the court's power in a particular case obviously must be made on a principled basis. For example, in *Chanen* it was noted that, even absent prosecutorial misconduct, a district court has a discretionary power to dismiss an indictment under limited circumstances where the court determines that dismissal is necessary to ensure fundamental fairness. Although in this case we review an exercise of supervisory power based on institutional concerns, *Chanen's* analysis is instructive. Before determining that dismissal was not warranted in that case, the court analyzed the dynamics of the constitutional scheme of separation of powers and the role of judicial supervisory power. The opinion explained that the court

---

**8.** *See, e.g.,* Excerpt of Record at 54-55, 57, 61, 70.

**9.** Moreover, we recognize that, although dismissal is a permissible exercise of a court's supervisory power in cases involving prosecutorial misconduct, this power is more often discussed than invoked. *See Samango,* 607 F.2d at 881; *Owen,* 580 F.2d at 367. Of the cases cited in *Chanen* in which prosecutorial conduct was allegedly inimical to the integrity of the judicial process, dismissal was warranted only in those in which the prosecutorial conduct was patently egregious. *Chanen,* 549

F.2d at 1309 12. *See, e.g., United States v. Estepa,* 471 F.2d 1132 (2d Cir.1972); *Laughlin v. United States,* 385 F.2d 287 (D.C.Cir.1967), *cert. denied,* 390 U.S. 1003, 88 S.Ct. 1245, 20 L.Ed.2d 103 (1968); *United States v. Wells,* 163 F. 313 (D.Idaho 1908); *United States v. DeMarco,* 401 F.Supp. 505 (C.D.Cal.1975), *aff'd,* 550 F.2d 1224 (9th Cir.), *cert. denied,* 434 U.S. 827, 98 S.Ct. 105, 54 L.Ed.2d 85 (1977); *United States v. Gallo,* 394 F.Supp. 310 (D.Conn.1975). *See also United States v. Rasheed,* 663 F.2d 843, 853 (9th Cir.1981), *cert. denied,* 454 U.S. 1157, 102 S.Ct. 1031, 71 L.Ed.2d 315 (1982).

and the prosecutor play limited, but supportive and complimentary roles vis-a-vis indictments. After delineating the respective roles of the court and the prosecutor,[10] the court then described the standard upon which the courts should rely in exercising their inherent supervisory power:

> [G]iven the constitutionally-based independence of each of the three actors—court, prosecutor and grand jury—we believe a court may not exercise its "supervisory power" in a way which encroaches on the prerogatives of the other two unless there is a clear basis in fact and law for doing so. If the district courts were not required to meet such a standard, their "supervisory power" could readily prove subversive of the doctrine of separation of powers.

*Chanen, supra,* 549 F.2d at 1313 (citation omitted).

We feel similarly compelled to perform a detailed analysis of the source and scope of a trial court's supervisory power before making the determination whether the power was properly invoked in the instant case.

■ As the *Chanen* court suggested, the *source* of the supervisory power doctrine in its present form is found in the complementary principles of separation of powers and checks and balances. The principle of separation requires that the judiciary, executive, and legislature be independent. The principle of balance requires that the three branches pursue inconsistent and conflicting goals. As Professor Nagel has explained:

10. As a practical matter, the grand jury generally relies on the prosecutor to determine what witnesses to call. Also, in practice the prosecutor conducts the examination of the witnesses and otherwise determines what evidence to present before the grand jury. [citations] In addition, it is the prosecutor who normally prepares the indictment, [citation] although of course the grand jury must review the indictment and adopt it as its own. [citation] Some of these functions—such as initiating a criminal case by presenting evidence before the grand jury—qualifies as "an executive function within the exclusive prerogative of the Attorney General." [citations]

> Separation of powers relies on the implementation of an "intellectual distinction" among the three major functions of government to ... [prevent tyrannical use of power]; accordingly the relevant case law is replete with assertions that the branches of government must be kept distinct and each must not interfere with the functioning of the others. In contrast, the doctrine of checks and balances buttresses the conceptual distinctions among the functions of government by providing for direct intervention by each branch into the functioning of the others; power can be checked only if it is shared.... For historical, pragmatic and conceptual reasons, American scholars have tended to favor a theory of constitutional balance over the theory of separation of powers.

Nagel, *Separation of Powers and the Scope of Federal Equitable Remedies,* 30 Stan.L. Rev. 661, 682 (1978).

■ The authority for a court's exercise of its supervisory power, therefore, can be traced to the structural balance articulated in Article III of the United States Constitution. *See* Note, *A Separation of Powers Approach to the Supervisory Power of the Federal Courts,* 34 Stan.L.Rev. 427, 443 (1982). It is clear that Article III authorizes the judicial branch to review the operations of the executive and legislative branches. *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803); *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952). Indeed,

> The court, on the other hand, exercises its power to summon witnesses to attend and to give testimony before the grand jury. Also, "it is the court which must compel a witness to testify if, after appearing, he refuses to do so." [citation] In addition, the court exercises a form of authority over the grand jury when, for example, it dismisses an indictment for failure to charge all elements of the offense or to warn the defendant fairly of the charge against which he must defend. [citation] Likewise, the court exercises authority over the prosecutor when it dismisses an indictment because of prosecutorial misconduct.
> *United States v. Chanen, supra,* 549 F.2d at 1312–13.

inter-branch review is a necessary function within the principle of checks and balances.

The principle of "checks and balances" embodies the notion that power can be checked only if it is shared; each branch has the right, if not the affirmative duty, to curb the excesses of the others. Therefore, the supervisory power emanates from the exercise of concurrent powers by the legislature, the executive, and the courts.

34 Stan.L.Rev. at 443–44.

The judiciary therefore should use its supervisory power to maintain its own institutional integrity, including the ability to administer an effective criminal justice system, as well as to maintain the institutional power of all three branches of government. The courts must not abdicate their responsibility to check the governmental excesses of the executive and the legislature;[11] the invocation of supervisory power may occasionally provide the necessary restraint of these excesses.

 This analysis also provides us with a means of determining the proper *scope* of the court's exercise of supervisory power in this case. When a court determines that institutional interests relating to judicial economy and the manageability of cases are threatened by pursuit of a particular indictment, it is appropriate to balance those interests with those of the executive in preservation of prosecutorial discretion, and to weigh the relative intrusiveness of action by each branch on the other's inherent functions. Specifically, we must determine whether the District Court's exercise of supervisory authority in this case unduly intruded into the domain of the executive branch, or, alternatively, whether the proposed actions of the prosecutor would have unduly disrupted the District Court's administration of justice. Following *Chanen,* we inquire whether the balance struck by

the District Court between the conflicting interests of the two branches has a clear basis on the facts of this case and under the relevant legal precedent. We proceed with this endeavor in light of the District Court's order of dismissal.

The trial court's order of dismissal stated in part:

. . . .

For purposes of deciding the pending motion, this Court need not decide if collateral estoppel bars the Government from bringing this indictment against Gonsalves. After all, different defendants were involved in the *Brown* [359 U.S. 41, 79 S.Ct. 539, 3 L.Ed.2d 609 (1959)] decision. Thus, this Court did not necessarily determine that it would refuse to exercise jurisdiction over any of the other defendants.

This Court is well aware that a conspiracy prosecution may be brought in any district in which any act in furtherance of the conspiracy was committed by any of the conspirators, even though some of them were never physically present there. *Title 18, U.S.C., § 3237(a);* Wright, *Federal Practice and Procedure:* Criminal § 303, pp. 589–90. And, the actions in Las Vegas of Ernest Franz Combs, Jr., an indicted coconspirator, and Gary Lynn Lickert, an unindicted coconspirator, could be used to establish the necessary overt act within this district. However, the problem in *Brown* was that the indictment was such a complex monstrosity that this Court decided it should have been broken down into several smaller, more manageable indictments. There simply was no good reason for those defendants to be indicted in this district given their alleged roles in the Government's conspiracy theory. This Court is confronted with the same problem with the indictment against Gonsalves.

---

11. As Professor Abraham Goldstein has perceptively noted, courts often mistakenly interpret the separation of powers to preclude *any* judicial role in prosecutorial discretion.

[Judicial passivity] . . . is rooted in a misunderstanding of the relation between the concept of discretion itself and the separation of powers. The absence of a clear-cut legal rule

defined by the legislature is treated by the courts as if it endows the prosecutor not only with discretion to fill the interstices in the rule but with an exclusively "executive" authority to do so.

A. Goldstein, The Passive Judiciary: Prosecutorial Discretion and the Guilty Plea 57 (1981).

Therefore, for the same reasons articulated in this Court's September 21, 1976, order and judgment of acquittal as to defendants Brown, Work and Snyder, this Court hereby exercises its discretionary supervisory powers and dismisses the indictment as against defendant Gonsalves.

Thus, the main ground given by the District Court judge for dismissing the indictment in this case was that it was "such a complex monstrosity" as to be unmanageable. The transcript of the hearing in which the order of judgment of acquittal was entered on behalf of Brown, Work, and Snyder reflects vividly the fact that the trial judge had had previous experience with massive conspiracy trials which broke down because of their size. Of course, this problem—of the Government attempting to force as many defendants as possible to trial in the same proceeding on the claim of a single conspiracy when the criminal acts could be more reasonably regarded as two or more conspiracies—is one which is not faced by judges in this circuit alone. In the Second Circuit, for example, one panel found it necessary to issue the following warning to the United States Attorney's Office:

In view of the frequency with which the single conspiracy vs. multiple conspiracies claim is being raised on appeals before this court, see *United States v. Rizzo,* 491 F.2d 1235 (2 Cir.1974); *United States v. De Marco,* 488 F.2d 828 (2 Cir. 1973); *United States v. Mapp,* 476 F.2d 67 (2 Cir.1973), we take this occasion to caution the government with respect to future prosecutions that it may be unnecessarily exposing itself to reversal by continuing the indictment format reflected in this case. While it is obviously impractical and inefficient for the government to try conspiracy cases one defendant at a time, it has become all too common for the government to bring indictments against a dozen or more defendants and endeavor to force as many of them as possible to trial in the same proceeding on the claim of a single conspiracy when the criminal acts could be more reasonably regarded as two or more conspiracies,

perhaps with a link at the top. Little time was saved by the government's having prosecuted the offenses here involved in one rather than two conspiracy trials. On the contrary, many serious problems were created at the trial level, including the inevitable debate about the single conspiracy charge, which can prove seriously detrimental to the government itself. We have already alluded to our problems at the appellate level, where we have had to comb through a voluminous record to give adequate consideration to the claims of eleven separate appellants.

*United States v. Sperling,* 506 F.2d 1323, 1340–41 (2d Cir.1974), *cert. denied,* 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975) (footnotes omitted). When the Government failed to heed the admonition, the court did in fact rely on *Sperling* in reversing the convictions of seven defendants convicted of conspiracy to violate the federal narcotics laws. *United States v. Bertolotti,* 529 F.2d 149, 151 (2d Cir.1975).

■ The District Court in this case had an ample factual and legal basis upon which to conclude that the indictment pursued by the prosecutor constituted a serious intrusion into the judiciary's interest in the fair administration of the criminal justice system. *See Payner, supra,* 447 U.S. at 735 n. 7, 100 S.Ct. at 2446 n. 7; *McNabb, supra,* 318 U.S. at 340, 63 S.Ct. at 612. Faced with the same complex indictment, and with the benefit of lengthy trial briefs, the opening statements of counsel, and the volumes of Government witness statements, the trial judge entertained the same serious concerns about the sheer impossibility of a manageable, fair trial that he expressed earlier in connection with Brown, Work, and Snyder. Our own review of the record, and indeed our mere recitation of the elaborate facts of the conspiracy outlined in the indictment, *see* Part I *supra,* show that the facts here justified the conclusion that to allow prosecution on this indictment would "gravely impair the basic function of" the District Court.

The court was not required to ignore the practical considerations attendant to a trial of this size and complexity, *e.g.,* the innumerable pretrial motions, the occupation of

weeks of the court's busy calendar, the superhuman tasks facing the jury,[12] and the likelihood of a mistrial. On the facts of this case the judge had a solid basis upon which to find the prospect of these horrors real and the resulting disruption of the judicial process great.

In contrast, the degree of encroachment upon the prerogatives of the prosecutor that a dismissal entails in this case is minimal. Although the court's order is not entirely explicit, it is clear that the indictment was dismissed without prejudice. The order suggested that the indictment be broken down into smaller, more manageable indictments, thus leaving the prosecutor free to reindict Gonsalves, and the other alleged conspirators, in a manner less intrusive upon the administration of a fair criminal justice system in the courts.[13]

The Government argues that a court never has the right to dismiss an indictment on the grounds of unmanageability, even if the dismissal is without prejudice. In support of this claim, it cites *United States v. Olson,* 504 F.2d 1222 (9th Cir.1974).[14] The trial judge in *Olson* had observed that the United States Attorney in his district consistently presented to the grand jury overly lengthy indictments which served to burden

12. As reflected in the transcript, one of the court's major concerns was the "dragnet effect" of complex conspiracy cases and the ability of a jury to digest and comprehend the evidence relevant to the defendant. *See* Excerpt of Record at 62–63.

13. The District Court recognized that when broken down into smaller conspiracies, indictments against some of the defendants may not result in proper venue in the Nevada District Court. *See* Excerpt of Record at 383–84 (Order dismissing the indictment against Gonsalves).

14. The Government cites other cases which it claims support its argument that the District Court's exercise of supervisory power in this case was improper: *United States v. Wilson,* 614 F.2d 1224 (9th Cir.1980), *United States v. Welch,* 572 F.2d 1359 (9th Cir.), *cert. denied,* 439 U.S. 842, 99 S.Ct. 133, 58 L.Ed.2d 140 (1978); *United States v. Hall,* 559 F.2d 1160 (9th Cir.1977), *cert. denied,* 435 U.S. 942, 98 S.Ct. 1523, 55 L.Ed.2d 539 (1978). *Olson,* however, while not controlling, is clearly the most relevant to the instant case. It is the only case cited by the Government that addresses the issue of the United States Attorney presenting unmanageable and overly-burdensome indictments to the courts.

*Hall* involved a defendant who had already served a one-year term for smuggling which had been granted on the condition that the "consent" to the entry of a civil decree of forfeiture of the merchandise. Defendant appealed and secured a dismissal of the indictment after which he was reindicted for the same offense. The District Court dismissed the indictment on the ground that it would be "unconscionable to proceed further" and retry the defendant. The appellate panel held, *inter alia,* that "unconscionability" was not a proper basis for the District Court's exercise of its inherent supervisory power since there was Ninth Circuit authority to the effect that "merciful inclinations" were not a sufficient basis for substituting judicial discretion for prosecutorial discretion in dismissing an indictment. *See United States v. Real,* 446 F.2d 40 (9th Cir. 1971). Moreover, the court noted that the Supreme Court had approved of reindictment and retrial under circumstances analogous to the case before it in *North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969). The case at bar, on the other hand, does not involve any issue of "unconscionability" or "merciful inclinations." Moreover, unlike the situation in *Hall,* there is no controlling authority on the issue of "unmanageability." Finally, in *Hall* and *Real* the trial court sought to prevent the indictment of the defendant; the trial court in the instant case simply refused to allow the prosecution of Gonsalves pursuant to *this* indictment.

In *Welch,* the defendant was convicted in federal district court of unlawfully transporting a firearm in interstate commerce and possession of a sawed-off shotgun. He appealed on the ground that it was against Justice Department internal policy to try him in federal court for the same act on which he had already been indicted (later dismissed) in state court. The appellate court affirmed the conviction, relying on a prior Ninth Circuit case which had held that a federal court has no authority to determine whether a federal prosecution violates an in-house policy of the Attorney General.

*Wilson* also involved a defendant who challenged her conviction on the ground that the United States Attorney's Office contravened its own guidelines, in this case by serving a forthwith subpoena on her only two hours before she was to appear before a grand jury. The court of appeals, relying in part on *Welch,* held that the guidelines in the United States Attorney's Manual do not have the force of law. Moreover, on a practical level the court held that the use of the forthwith subpoena under the facts before it was not an abuse of discretion. *Welch* and *Wilson* obviously provide no authority for the resolution of the issues presented in this case.

the court with extended jury trials and complex jury instructions. The judge's solution was to attempt to force the prosecutor to pare down the indictment before trial to conform to the judge's desires. When the Government refused to elect one out of the four counts on which to proceed to trial, the District Court dismissed the entire indictment with prejudice.

*Olson* is distinguishable in that the District Court's rationale for its order of dismissal was solely that it was "highly improbable" that the court would impose consecutive sentences and that a conviction on all four counts was therefore unnecessary. The Government refused to elect on the grounds that (1) there was no showing that the joinder of the four counts and their simultaneous trial would prejudice either defendant or the Government, and (2) the election of the conspiracy count would not shorten the trial because the principal evidence to be produced—tape recorded conversations of the defendant and an informant—would also support the three remaining substantive counts. The prosecution claimed it would be impossible to play the tape recordings without the jury hearing information which would support all four counts.

*Olson* therefore does not support the proposition that a trial judge may never dismiss an indictment on the basis of unmanageability. Rather, *Olson* stands for the proposition that a dismissal with prejudice is not an appropriate exercise of a court's supervisory power when a prosecutor fails to heed the court's "suggestion" that all but one of a number of counts of an indisputably valid indictment be dropped. No practical or legal grounds supported the summary dismissal in that case; indeed, such drastic action by the District Court on the basis of such facile reasoning intruded unduly on the historic role of the prosecutor. *Olson,* therefore, and other cases on which the Government relies, are distinguishable on the basis that a complete termination of the criminal prosecution, *i.e.,* a dismissal with prejudice, entails an undue intrusion into prosecutorial prerogatives.

15. *See* note 14, *supra.*

*See, e.g., United States v. Hall,* 559 F.2d 1160, 1165 (9th Cir.1977), *cert. denied,* 435 U.S. 942, 98 S.Ct. 1523, 55 L.Ed.2d 539 (1978) (district court judge has no power to dismiss indictment on ground "it would be unconscionable to proceed further"); *United States v. Real,* 446 F.2d 40 (9th Cir.1971) (district court judge improperly dismissed indictment on ground of "merciful inclinations" toward defendant).[15] Such dismissals may easily constitute an example of the improper substitution of judicial discretion for prosecutorial discretion. It remains the prerogative and responsibility of the executive to determine whether to prosecute at all. In contrast, the district judge in this case left the Government free to reindict the defendant, either in the same district pursuant to a more manageable indictment, or in another district, should a new indictment reveal a lack of jurisdiction over this particular defendant.

We conclude, therefore, that the intrusiveness of this cumbersome indictment on the judicial machinery is so great, while that on prosecutorial discretion so slight, that the district court did not abuse its discretion in using its inherent supervisory powers to dismiss the indictment.

AFFIRMED.