**UNITED STATES of America, Plaintiff,**

**v.**

**Robert "Debe" DiBERNARDO, et al., Defendants.**

**No. 80–56–Cr–EPS (S1–S16).**

United States District Court,
S.D. Florida,
Criminal Division.

Dec. 20, 1982.

Fred A. Schwartz, Marcella S. Cohen, Miami, Fla., for plaintiff.

Todd Lyster, Chicago, Ill., Arthur M. Schwartz, Denver, Colo., Burton Sandler, Towson, Md., Elliott J. Abelson, Beverly Hills, Cal., Rebekah J. Poston, Miami, Fla., John F. Sheehan, Providence, R.I., William E. Seekford, Towson, Md., Robert M. Leen, Hollywood, Fla., Bernard Berkman, Cleveland, Ohio, Roger Jon Diamond, Pacific Palisades, Cal., Jeffrey M. Cohen, Miami, Fla., Anthony M. Glassman, Beverly Hills, Cal., David Bogenschutz, Hollywood, Fla., Robert Smith, Encino, Cal., Theodore Klein, Corey E. Hoffman, Miami, Fla., Michael Klein, Los Angeles, Cal., John H. Weston, Beverly Hills, Cal., Herald Price Fahringer, New York City, Henry J. Boitel, Rockville Centre, N.Y., Joel Kaplan, Miami, Fla., Stephen J. Finta, Fort Lauderdale, Fla., Humberto Aguilar, Miami, Fla., Ralph J. Schwarz, Jr., New York City, Gerald M. Werksman, Chicago, Ill., Phillip E. Kuhn, Memphis, Tenn., A. Matthew Miller, Hollywood, Fla., Joel Hirschhorn, Miami, Fla., for defendants.

## MEMORANDUM OPINION AND ORDER DISMISSING INDICTMENTS WITHOUT PREJUDICE

SPELLMAN, District Judge.

THIS CAUSE is before the Court on several motions by various Defendants to dismiss the indictments and motions to adopt

and join in the same. Basically, there are two convincing arguments for dismissing the indictments in these cases: tainted grand jury testimony and abuse of the grand jury process.

## I. BACKGROUND

In the summer of 1977, the F.B.I. commenced an undercover investigation of major national distributors of sexually explicit films and magazines. Two F.B.I. agents were chosen to pose as pornographers. Special Agent Patrick Livingston played the role of Pat Salamone and Special Agent Bruce Ellavsky posed as Bruce Wakerley.

Together the two undercover agents made contacts throughout the country with national distributors of pornography and arranged to have the merchandise shipped to them in Miami, Florida. The operation was known as "Miporn".

On June 19, 1979, the Government began to present its case to Grand Jury 79–4. For approximately eight months (June 19, 1979 to February 11, 1980), the Grand Jury heard testimony regarding an alleged nationwide conspiracy to knowingly transport in interstate commerce for the purpose of sale and distribution obscene, lewd and lascivious material in violation of Title 18, United States Code, Section 1465.

On February 12, 1980, the Grand Jury returned an indictment charging forty-five (45) Defendants in one count of conspiracy to commit interstate transportation of obscene material. The indictment listed seventy-nine (79) separately numbered paragraphs of alleged overt acts, all in violation of Title 18, United States Code, Section 371, and seventeen (17) substantive counts involving small groups of Defendants, all in violation of Title 18, United States Code, Section 1465 and Section 2.

As part of the conspiracy, it was alleged that the Defendants would facilitate the collection of debts within the obscenity industry and enforce the prohibition against unauthorized duplication of obscene films and motion pictures which are owned, manufactured, and distributed by members of the conspiracy through use of boycotts, threats of force and force. To substantiate the above, the Government presented evidence that it assumed would establish a nationwide conspiracy of organized crime individuals who used violence to control the "pornography industry". This evidence included repeated references to mafia control and policies of using violence and extortion. In addition, contemporaneously with the presentation of the evidence relating to this "national" conspiracy to distribute obscene material across state lines, the grand jury heard evidence regarding additional conspiracies to pirate copyrighted films. In fact, the same jury that returned the indictment in this case, *United States v. DiBernardo, et al.,* 80–56–Cr–EPS, involving the alleged national pornography conspiracy, also simultaneously returned the indictments in *United States v. Bernstene, et al.,* Case No. 80–57, and *United States v. Gottesman, et al.,* Case No. 80–59.

On February 14, 1980, nationwide arrests and searches were conducted. The Defendants were arraigned during the period of March 5th through the 14th, 1980.

The Government dismissed the original indictment. On October 15, 1980, the Government filed superseding indictments, effectively severing the various groups of Defendants into separate conspiracies unrelated to the conspiracies alleged in the other indictments.

At this time, four of the sixteen cases have been tried. The trials have resulted in three convictions, *United States v. DiBernardo, et al.,* 80–56–Cr–EPS (S12), *United States v. Peraino, et al.,* 80–56–Cr–EPS (S3) and *United States v. Bagnell,* 80–56–Cr–EPS (S14) and one acquittal, *United States v. Bernstene,* 80–56–Cr–EPS (S9).

With twelve of the sixteen cases remaining to be tried, a most unexpected turn of events transpired. On January 21, 1982, the prosecutor in charge of the Miporn prosecutions advised this Court that Special Agent Patrick Livingston had been arrested for shoplifting. After discussions with the Court, the prosecutor by letter dated February 12, 1982, advised all Miporn counsel of

the Livingston arrest. In this letter, the prosecutor explained that Agent Livingston had been arrested for shoplifting and at that time, identified himself as Pat Salamone. Moreover, the prosecution indicated that Livingston had psychiatric problems which made it difficult for him to distinguish between his real identity and his undercover identity.

Following the above disclosure, several Miporn defense counsel made discovery motions requesting Special Agent Livingston's personnel files, administrative file, and any other file arising out of disciplinary or other proceedings relative to Special Agent Livingston's arrest in November, 1981. Defense counsel also requested the disclosure of all grand jury testimony given by Special Agent Livingston and urged this Court for an evidentiary hearing regarding the entire shoplifting incident.

This Court ordered the Government to produce the requested material for *in camera* inspection. The Court reviewed all files produced and made the determination to disclose all the relevant material including Special Agent Livingston's grand jury testimony. In addition, the Court appointed several psychiatrists to examine Special Agent Livingston to determine whether within reasonable psychiatric certainty a diagnosis can be made as to Special Agent Livingston and how long and to what degree his present condition existed and whether this condition would affect his past, present and future testimony in this case.

To determine what happened, why it happened, and in an effort to discover the truth, this Court granted defense counsel's motion for an evidentiary hearing. For thirteen days, this Court heard testimony from some fourteen witnesses including several psychiatrists who examined Special Agent Livingston, and numerous F.B.I. supervisors and agents who worked with him.[1] The Court even heard testimony from Special Agent Livingston's close friend, Bill Brown, Esq. In fact, as the hearing progressed, it became apparent that a delicate situation was developing with regard to when the prosecutors discovered the Livingston incident. As a result, the Miporn prosecutor, Fred Schwartz, was relieved of his position for purposes of the remainder of the evidentiary hearing, and he and Marcella Cohen were called as witnesses.[2]

1. The evidentiary hearings before this Court took some thirteen days. The Court commenced these proceedings on Tuesday, June 15, 1982 and heard testimony until Friday, June 18, 1982. During this first week, the Court heard testimony from: Dr. William Corwin; Arthur Nehrbass, the former Special Agent in charge of the Miami Office of the F.B.I.; Gordon G. McNeil, Supervisor of all organized crime investigation in the Miami Office for the F.B.I., March 1978 to January 1981; Dr. Paul S. Jarrett; Michael Griffin, Special Agent Supervisor of the F.B.I., Louisville, Kentucky; and James T. Blasingame, Assistant Special Agent in charge of the F.B.I. for the State of Kentucky.

The Court recessed these proceedings on Friday, June 18, 1982 and reconvened on Tuesday, September 14, 1982. The Court heard testimony from September 14, 1982 until Friday, September 17, 1982. During this second week, the Court once again heard from Mr. Blasingame. Additional testimony was taken from James H. Yelvington, who was in the fall of 1981 Special Agent in charge of the F.B.I. for the Division of Louisville, Kentucky; Mr. William Brown, Esq., a close personal friend of Special Agent Livingston; Dr. Dennis Koson; and Fred Arthur Schwartz, the prosecutor in charge of the Miporn prosecutions.

On Thursday, September 23, 1982, the Court began the third week of testimony. On September 23 and September 24, 1982, the Court heard the testimony of Special Agent Patrick Livingston.

The last week of testimony was from Tuesday, September 28, 1982 until Thursday, September 30, 1982. During this last week, the Court heard testimony from Special Agent Patrick Livingston; Special Agent Bruce Edward Ellavsky, who was Special Agent Livingston's partner in the Miporn investigation; Gordon G. McNeil was recalled; Special Agent Gary Warren Aldrich, who worked with Special Agent Livingston on the Miporn investigation; and Marcella Sue Cohen, Attorney for the Miami Strike Force assigned to prosecute the Miporn cases.

2. Defendants moved to have Special Attorney, Fred A. Schwartz, removed as Federal Prosecutor for purposes of the Livingston Evidentiary Hearing. The Court found that Mr. Schwartz was more properly a witness than an advocate in this matter. Since he had an opportunity to observe Special Agent Livingston throughout the entire period of time relevant to the hearing and because his testimony was essential to

At the hearing, a multitude of exhibits were offered and admitted into evidence. These exhibits included depositions of other psychiatrists who examined Special Agent Livingston, F.B.I. reports, memoranda, airtels and other correspondence and reports relevant to the proceedings. On September 30, 1982, this Court concluded the evidentiary hearings.

## II. ANALYSIS

The Court now has pending before it: Motions For New Trials, Motions to Dismiss the Indictments, Motion to Exclude the Testimony of Special Agent Livingston, and Motion for an Evidentiary Hearing and For Discovery on the Issue of Selective Prosecution. Counsel for the defense and prosecution have extensively briefed the legal and factual issues relative to their respective Motions. Moreover on November 12, 1982, this Court heard oral argument with regard to all pending Motions involving Special Agent Livingston. Therefore, at this time, the Court finds itself in an excellent posture to rule on the pending Motions.

After closely examining all the evidence, this Court concludes that Special Agent Livingston has a serious credibility problem. Although this Court does not comment on whether former testimony given by Special Agent Livingston was true or false, it does clearly find that his testimony before the grand jury is tainted. Without attempting to catalog all the varied lies and indiscretions on the part of Special Agent Livingston, the Court does find the following facts as supportive of its opinion.

### A. TAINTED GRAND JURY TESTIMONY

On or about March 17, 1980, SAC Nehrbass, who was the F.B.I. Agent in charge of the Miami Office at the time, contacted a psychiatrist, Dr. Alfredo Balasini, expressing concern for the mental health of Special Agent Livingston. On Wednesday, March 26, 1980, SAC Nehrbass wrote a letter to Dr. Balasini. In pertinent part the letter states:

The Agent that I am concerned about is Patrick J. Livingston, who has exhibited indications of abnormal intensity respecting his continuing role in a particular investigation into organized crime involvement in pornography in the United States. He fulfilled an undercover assignment for two and a half years posing as a pornographer. The perception of the other individuals who were involved in this investigation is that *Livingston now feels he is the only individual who can bring this case to a successful conclusion, that it is essential he coordinate everyone's efforts, and that he feels that other members of the team are conspiring to 'take the case away from him.'* Livingston played a most convincing role during these two and a half years. He demonstrated that he has the ability to gain people's confidence and, of course, for two and a half years has practiced a huge deception. This background and apparent ability may carry over into his 'normal' life in that he is probably capable of deceiving as to his true present personality, at least for short periods of time. (Emphasis added).

The Court finds the above observation particularly significant when one considers that just one month prior to the writing of this letter Special Agent Livingston was testifying before the grand jury that returned the Miporn indictments.

On May 13, 1980, Dr. Balasini wrote a letter to SAC Nehrbass containing a diagnosis and a prognosis. In this letter, Dr. Balasini states that "whatever symptoms Mr. Livingston displayed prior to my interview with him were no longer present at the time of examination" and that the diag-

---

some of the issues before the Court such as the timeliness of *Brady* disclosures and the like, Mr. Schwartz was removed as prosecutor. *See* Ethical Consideration 5–9; Disciplinary Rule 5–102(B) and *United States v. Treadway,* 445 F.Supp. 959 (N.D.Texas, 1978).

The Court found it unnecessary to exclude Mr. Schwartz from the hearing. In this regard, the Court found that Mr. Schwartz should not be treated any differently than a case agent. Federal Rule of Evidence 615(2).

nosis was adjustment reaction to adult life and the prognosis was good with no treatment necessary at this point. However, Special Agent Livingston in a written statement to his superiors in the F.B.I. admits that he told Dr. Balasini only what he wanted to hear. (Special Agent Livingston's January 27, 1982 letter in response to charges by Oliver B. Revell at page 7).

Sometime later in 1980, William J. Brown, Esq., who is a close personal friend of Special Agent Livingston, contacted Dr. Carl H. Marlowe. Mr. Brown expressed a concern regarding Special Agent Livingston's deteriorating personality. Dr. Marlowe referred Livingston to Dr. Gurri.

Dr. Gurri's diagnosis of Agent Livingston was "acute adult situational reaction." (Deposition of Joseph N. Gurri dated May 6, 1982 at 48).[3] According to Dr. Gurri, Special Agent Livingston's main concerns involved some marital difficulties and role adjustment after prolonged undercover work. *Id.* at 35 and 98.

In September of 1980 pursuant to his transfer from Miami, Special Agent Livingston reported to the Louisville, Kentucky office for duty. On November 10, 1981, Special Agent Livingston went to Bacon's Department store in St. Matthews, Kentucky. He drove there in his F.B.I. vehicle and left his then three year old son sleeping in the car. Sometime after entering the store, he put several items of clothing all his size in a Bacon's department store bag. As Special Agent Livingston prepared to leave the store carrying the bag, he was stopped by a security person and accused of attempting to shoplift. Special Agent Livingston immediately denied any wrongdo-

ing and identified himself as Pat Salamone. He also produced a Kentucky drivers license in the name of Pat Salamone.

Special Agent Livingston was then arrested for shoplifting and transported to the police station. Sometime after arriving at the police station, Special Agent Livingston made a call to his F.B.I. Supervisor Michael Griffin. Special Agent Livingston explained to Griffin what had transpired. Griffin told him to admit his true identity and Livingston did. Special Agent Livingston was released on his own recognizance. On November 11, 1981, Supervisor Griffin required Livingston to surrender all his undercover identification and his weapon.[4]

On November 17, 1981, Special Agent Livingston made a sworn statement to SAC Yelvington, who in the Fall of 1981 was Special Agent in Charge of the F.B.I. for the Division of Louisville, Kentucky. In this statement, Special Agent Livingston lied about the shoplifting event. He stated the bag was not in his possession and he did not know what the security person was talking about. He said he was falsely accused and that "[a]t no time did I have a bag in my possession while at Bacon's Department store, nor did I take any clothing for my own use." He also stated that he identified himself as Pat Salamone "because I thought this was the only identification I had on me."

At a later date in response to a letter from Oliver Revell of the F.B.I. stating that the Bureau was considering administrative action, Agent Livingston restates the factual history of the shoplifting incident. In this letter of January 27, 1982, Agent Livingston admitted that he picked up the

---

3. In an Order dated April 14, 1982, this Court granted defense counsel's motion to take the depositions of Doctors Richards, Gurri, Riddick and Balasini, all of whom examined Special Agent Livingston during the relative period of time in question here.

4. The shoplifting charges against Special Agent Livingston were ultimately dismissed. At one time, Special Agent Livingston had petitioned "the Commonwealth Attorney's Office for consideration under the Diversion Program wherein community service for a six-month period

would be the alternative to entering a guilty plea." (F.B.I. airtel from SAC, Louisville to Director, F.B.I. dated February 26, 1982). However, after changing attorneys, Special Agent Livingston rejected the Commonwealth Attorney's Diversion Program.

Bacon's Department store initially agreed to a reduction of its charges from a felony to a misdemeanor. However, later Bacon's agreed to dismiss the charges in exchange for a signed waiver from Special Agent Livingston not to sue for false arrest. *Id.*

items of clothing and put them in the bag. With reference to being confronted by the woman employed at Bacon's, Livingston explains that he denied association with the bag because he knew the situation looked bad. He also admitted that on November 26, 1981 he told Supervisor Griffin that he put the items of clothing in a Bacon's bag and was stopped by a Bacon's security employee with the bag in his possession.

At the evidentiary hearing, several F.B.I. Agents related the shoplifting incident as Livingston told them. A.S.A.C. Blasingame, who is the Assistant Special Agent in Charge of the F.B.I. for the State of Kentucky, noted in a November 13, 1981 memorandum that Livingston reported to Griffin "that when arrested he told the security officer at Bacon's department store that he was Pat Salamone as that was the only identification he had with him." The truth was that Agent Livingston had his real drivers license in his possession.

With regard to the same incident, Supervisor Michael Griffin in his internal F.B.I. memorandum transcribed December 10, 1981 relates his discussion with Special Agent Livingston on November 26, 1981. Griffin relates "Livingston stated he identified himself as Patrick Salamone in this incident because he knew that Pat Livingston would not steal these items as he . . . (Livingston) didn't need the items but that Patrick Salamone would do something like that."

It appears to the Court that every time Special Agent Livingston relates the shoplifting incident he changes his story. At his deposition, Dr. Richards stated that Special Agent Livingston had admitted shoplifting but would not admit he did it intentionally.

(Deposition of Dr. Richards, dated May 5, 1982, at 44 and 45). Dr. Jarrett, one of the Court-appointed psychiatrists, reported that Livingston told him the only identification he had with him while in the department store was the drivers license of Patrick Salamone. Dr. Corwin's rendition of the facts of the shoplifting incident revealed that Livingston repeatedly denied the charges, and that while Livingston admitted having the clothing in his possession he had planned to pay for them before he left the store. Livingston also told Dr. Corwin that his real drivers license was in the car. Dr. Stillman recounts the facts of the shoplifting incident as related to him by Livingston making it clear that Livingston conveyed the impression that the accusations were baseless and simply a mistake. Dr. Sadoff notes that Livingston told him that when he was stopped in the store he said it was all a mistake and showed the security person his Salamone identification. Livingston admitted to Dr. Sadoff that he knew that he had his real drivers license in his wallet but it was not as accessible as the Salamone license.[5]

Agent Livingston testified before this Court. He stated that in his January 27, 1982 letter to Revell he intended to admit his intent to shoplift. However, as noted above, months after the shoplifting incident when questioned by mental health professionals he gives conflicting accounts of the incident. In fact, while testifying before this Court, Agent Livingston first stated that he did not know whether he intended to steal or not, then he admitted that he intended to shoplift and still later stated he was confused and was not sure what he was doing.[6]

5. On April 12, 1982, Dr. Sadoff examined Special Agent Livingston at the request of Oliver B. Revell, Assistant Director, Administrative Division, F.B.I. He sent a report to Mr. Revell dated April 19, 1982 in which he characterizes Special Agent Livingston's shoplifting incident as "a cry for help and a way of calling attention to his difficulties." Dr. Sadoff's report, dated April 19, 1982 at 7.

6. For instance, when asked whether he was attempting to perpetrate a deceit by giving the

security person the Salamone identification the following exchange took place:
Q. And you knew that you were deceiving them or attempting to deceive them as to your identity, did you not?
A. I knew I was Livingston, and I knew I was giving the driver's license in the name of Salamone.
Q. You knew you were attempting to perpetrate a deceit?
A. I don't—they asked for a license, I pulled my wallet out and gave them a license. I did

Also significant in the Court's conclusion that Special Agent Livingston's testimony has tainted these proceedings is the evaluation of the psychiatrists who examined him. For instance, Dr. Corwin was asked a hypothetical question in which Livingston was called to testify as an undercover agent for the F.B.I. where the F.B.I. wanted a conviction and where Livingston's testimony would be crucial in obtaining that conviction. Dr. Corwin stated that Livingston would be more likely to give testimony favorable to himself and the F.B.I. as opposed to telling the truth.

> The Court then questioned Dr. Corwin:
> THE COURT: Based on reasonable psychiatric probability, would he have a tendency to lie on occasion, manifesting the diagnosis that you made strictly where that testimony might be on a very sensitive area which he is called upon to address himself?
> THE WITNESS: Yes, I think he could.
> THE COURT: Based on psychiatric probability?
> THE WITNESS: Yes, it is my opinion that he could. (Transcript of Hearing [Tr.], 6/15/82 at 219.)

Dr. Koson, who was an independent psychiatrist called by the defense and who examined Special Agent Livingston, gave his professional opinion with regard to Livingston's credibility:

> Q. Doctor, let me ask you, finally: Have you an opinion, based upon reasonable psychiatric probability, whether Mr. Livingston would have, as you put it, a propensity to lie or penchant or tendency to lie on an occasion where that testimony might be in a very sensitive area and where it might serve Mr. Livingston's own personal needs?
> A. Yes.
> Q. What is that opinion?
> A. In my opinion, he has a propensity or a tendency to lie when he needs to, in those situations where it might meet his needs. And he is good at it, has a propensity for doing that, and he has demonstrated that, and it depends on the situation and the conditions in his own needs and the time. (Tr. at 1508).

Dr. Koson also noted it would be "very difficult" for a jury to determine if Livingston was telling the truth. In his opinion, because of Livingston's tremendous skill and capability of deception he presents a much more formidable liar than the average witness. Moreover, Special Agent

> not think that, no, I was going to do this, or I was going to do that—
> *The Court:* Can you answer the question? Were you attempting to deceive them or not?
> *The Witness: I don't know if I was attempting to deceive them or not.* I mean, I gave them the Salamone license, yes. (Tr. at 1860, emphasis added).

Under more insistent questioning, Livingston changed his testimony:

> Q. So, let's just stay back a little bit and I will ask you again, you know you were deceiving them, didn't you?
> A. *As soon as I gave them the license, I knew I was deceiving.*
> Q. As you were giving them the license, *it was your intent to deceive, was it not?*
> A. *I guess.* (Tr. at 1861, emphasis added).

The questioning continued and Special Agent Livingston had difficulty answering the questions directly. The Court then questioned Special Agent Livingston:

> *The Court:* The question is, at the time you were asked for the driver's license, did you not make a conscious choice to bring out the Salamone driver's license rather than the Kentucky Livingston driver's license? It's a simple question, did you make a conscious decision to take one as against the other?
> *The Witness:* Well, you know, I guess I did. I pulled my wallet, the Salamone license was on top, I pulled it out and gave it to him—
> *The Court:* Patrick, Patrick, nobody knows whether you did or not. Now you can't say I guess I did. You either did consciously or did not, and the question is one that needs to be answered.
> Did you consciously take out the Salamone driver's license as against the Livingston driver's license?
> *The Witness:* Yes.
> *The Court:* Okay. (Tr. at 1868–1869).

When asked whether in his letter to Revell he intended to acknowledge his intent to shoplift, Special Agent Livingston responded:

> A. I think I acknowledge the event that occurred out there—
> *The Court:* The question was, did you intend to?
> *The Witness:* Yes. (Tr. at 1957).

He was then asked:

> Q. Did you acknowledge an intent to steal?
> A. Yes. (Tr. at 1957–1958).

Yelvington reported that he could not in good conscience ask another agent to work with Special Agent Livingston. In fact, testifying before this Court under oath, Yelvington, Livingston's direct superior in Kentucky, stated that without independent knowledge of the facts, he would not believe Livingston. (Tr. at 1049).

Although Special Agent Livingston's lies and indiscretions have been limited to the issues framed regarding the shoplifting event, the Court finds from the evidence that he has a great propensity to lie. This Court makes the sad but inevitable conclusion based on the evidence and its personal observation that at present, Patrick J. Livingston would lie when the truth would serve him best. Whether this condition existed but laid dormant or whether it is attributable to wounds suffered while playing the undercover role for two and a half years is immaterial to this Court's determination.[7]

In *Mesarosh v. United States,* 352 U.S. 1, 77 S.Ct. 1, 1 L.Ed.2d 1 (1956), the United States Supreme Court found that "[t]he dignity of the United States Government will not permit the conviction of any person on tainted testimony." *Id.* at 9, 77 S.Ct. at 5. The Court in *Mesarosh* concluded that since the conviction was tainted, there could be no just result than to accord petitioners a new trial.

The defendant in *Mesarosh* was convicted for conspiring to violate the Smith Act by advocating the violent overthrow of the government. The United States Supreme Court had already granted *certiorari* when the Solicitor General moved for remand to the trial court for further proceedings. In his motion, the Solicitor General called to the Court's attention false testimony given in subsequent proceedings by Mazzei, who was a key witness for the Government in *Mesarosh.*

Although the Solicitor General believed the actual testimony given by Mazzei at the

*Mesarosh* trial was truthful, the subsequent lies taken cumulatively led the Government to believe that the issue of Mazzei's truthfulness should "be determined by the District Court after a hearing." *Id.* at 4, 77 S.Ct. at 2.

The post-trial testimony of Mazzei revealed that he lied in a variety of different contexts. Some of his discredited post-trial testimony dealt with the Communist conspiracy issue. Other false testimony by Mazzei involved his pleading guilty to adultery and bastardy in a Pennsylvania state court and then a year later petitioning to set aside the guilty plea, claiming he had been induced to enter the plea by the F.B.I. The F.B.I. denied any such thing. *Id.* at 5, 77 S.Ct. at 3. Additionally, Mazzei contended that the F.B.I. had arranged to get him into the Army as part of an undercover assignment and had sometimes paid him $1,000 a month for expenses. The F.B.I. denied having anything to do with his career in the Army and claimed it paid him a total of $172.05 for expenses over a ten-year period. *Id.* at 7, 77 S.Ct. at 4.

The government indicated that the untrue subsequent statements may have been caused by psychiatric problems which arose subsequent to trial. Without remanding the case for an evidentiary hearing on the matter the United States Supreme Court ordered a new trial because the conviction was tainted. The Court noted:

> The district judge is not the proper agency to determine that there was sufficient evidence at the trial, other than that given by Mazzei, to sustain a conviction of any of the petitioners. *Only the jury can determine what it would do on a different body of evidence, and the jury can no longer act in this case.* (Emphasis added).

Id. at 12, 77 S.Ct. at 7.

The Court found that Mazzei's testimony polluted the waters of justice. In the words of the Court:

**7.** The court is aware that although the decision is not final, the F.B.I. has discharged Special Agent Livingston for having given perjured statements to the agency relating to the shoplifting incident. Although the Court does not take a position one way or the other with regard to Special Agent Livingston's retention by the F.B.I., it does believe that due consideration should be given to the medical testimony in determining whether he is entitled to disability.

*The untainted administration of justice is certainly one of the most cherished aspects of our institutions.* Its observance is one of our proudest boasts. This Court is charged with supervisory functions in relation to proceedings in the federal courts. *See McNabb v. United States,* 318 U.S. 332 [63 S.Ct. 608, 87 L.Ed. 819]. Therefore, fastidious regard for the honor of the administration of justice requires the Court to make certain that the doing of justice be made so manifest that only irrational or perverse claims of its disregard can be asserted. *Communist Party v. Subversive Activities Control Board,* 351 U.S. 115, 124 [76 S.Ct. 663, 667, 100 L.Ed. 1003]. (Emphasis supplied).

*Id.* at 14, 77 S.Ct. at 8.

Applying the *Mesarosh* reasoning in *Williams v. United States,* 500 F.2d 105 (9th Cir.1974), the Court held that a defendant who had filed a petition for habeas corpus was entitled to a new trial by reason of tainted material testimony of a government agent. In *Williams,* the defendant was convicted for selling and facilitating the sale of heroin. The conviction was affirmed. Williams then filed a habeas corpus pursuant to 28 U.S.C. § 2255 and the District Court denied it. Williams appealed and the Ninth Circuit reversed.

■ In *Williams,* a narcotics agent who testified against Williams at his trial later pled guilty to conspiracy to deprive a person of his civil rights. The fact that this government agent gave material testimony against Williams and then subsequently was charged with perjury and convicted of another crime compelled the Court to grant Williams a new trial. The other investigation was similar in nature and contemporaneous with Williams' case. A conviction cannot stand based substantially upon tainted evidence. *Id.* at 108.

■ This Court finds the reasoning in *Mesarosh* and *Williams* applicable to the case at hand. Special Agent Livingston's subsequent behavior and perjurious propensities have created a significant taint on the administration of justice. In the Court's opinion, the *Mesarosh* reasoning is just as compelling with regard to testimony before a grand jury as it is before a petit jury. Therefore, the only way of being absolutely sure that the taint is removed is to dismiss the instant indictments and allow the government to go before a new grand jury and present the evidence with full disclosure of all the facts.

The Court is mindful that dismissal of a grand jury indictment is a drastic remedy and courts are very reluctant to dismiss indictments. However, pursuant to the Court's supervisory power and in the interest of justice, this Court believes that there exists ample factual and legal basis upon which to conclude that this indictment constitutes a serious intrusion into the judiciary's interest in the fair administration of the criminal justice system.[8]

The difficulties and complexities of this case do not end with Special Agent Livingston's situation. If presented only with the Livingston situation, this Court might be inclined to fashion some alternative remedy. This is so especially in light of the precedential ramifications a decision such as this might have. However, the facts in this case present a more serious and compelling situation than where one is merely confronted with subsequent false testimony of a key government witness. There is, in addition, a serious question with regard to abuse of grand jury process.

## B. ABUSE OF THE GRAND JURY PROCESS

On December 5, 1980, counsel for the Miporn defendants made a motion to inspect grand jury minutes and to dismiss the indictment because of improper presentation of evidence to the grand jury or abuse of the grand jury process. This Court denied the motion. The denial was based on the fact that the defense attorneys' assertions were based on deductions and extrapolations of the off-the-record comments made by the prosecuting attorneys.

8. The Court's supervisory power is discussed at pages 1328–1329 *infra.*

After receiving Special Agent Livingston's grand jury testimony, the defendants reasserted their previous motion. The charge of grand jury abuse is based on grand jury taint. Specifically, defendants complain that evidence of organized crime, violence, illegal duping and pirating of copyrighted material, references to loan sharking, trafficking in drugs and automatic weapons was presented to the grand jury in the first indictment. Defendants claim that this evidence was fatally prejudicial and unrelated to the alleged violations of Title 18, United States Code, Section 1465. Moreover, the defendants assert that the presentation of such evidence made it near impossible for the grand jurors to focus on the delicate first amendment questions at issue.

The defendants contend that once having been tainted the grand jury could not make the necessary separation of evidence as required. According to the defendants, when the prosecution went before the grand jury the second time, the grand jury should have been instructed that they were no longer to view all prior testimony as connected but must focus on individual culpability.

The Court ordered all the grand jury testimony produced for *in camera* inspection. Having reviewed all the testimony heard by the grand jury, the Court finds a serious problem exists.[9] The prosecutor at no time instructed the grand jury returning the superseding indictments to disregard the evidence related to the organized crime connections and violent activities of other individuals, and additional irrelevant evidence unrelated to the separate defendants involved in the individual conspiracies. In this regard, the Court finds the grand jury was originally tainted by the presentation of highly prejudicial evidence totally unrelated to the individual conspiracies charged and that the grand jury process was again abused at the time of the superseding indictments. Had the prosecution sought and received indictments with regard to the Racketeer Influenced Corrupt Organization Act (RICO), Title 18, United States Code § 1961 *et seq.* the Court would be more sympathetic; however, no such indictment was returned. Moreover, when the situation involved a national conspiracy the presentation of certain seemingly unrelated and prejudicial testimony may arguably have been proper, but when viewed in light of the superseding indictments which charged only small conspiracies with regard to a few films or other items, there is a serious question as to improper presentation of evidence to the grand jury and abuse of the grand jury process.

Along the same lines, the defendants claim that the indictment should be dismissed because misconduct by the prosecutor usurped the role of the grand jury. According to defense counsel, the Miporn prosecutor had knowledge of Special Agent Livingston's problems before the second grand jury convened. With regard to this, counsel for the defense direct the Court's attention to the testimony of Arthur Nehrbass, the Special Agent in Charge of the Miami Office of the F.B.I. from April 1979 until late December 1981, where he

---

9. Upon reviewing the grand jury transcripts the Court found numerous references to "mafia" and "organized crime". The testimony before the grand jury contained continual references to a nationwide conspiracy linked to organized crime. (Tr. 8/21/79 at 43–44). The Court also finds repeated references to the fact that the "Miporn" defendants used force and violence to control and police the pornography industry. (Tr. 7/19/79 at 20–21 and at 52). Moreover, testimony given before the grand jury and not disclosed to defense counsel revealed that an individual testified that the interstate transportation of obscenity is "mafia" controlled, and policed by violence. (Tr. 11/28/79 at 12 and 22).

The following is illustrative of the type of irrelevant, prejudicial testimony which tainted the proceedings:

Q. What squad of the Miami office of the F.B.I. are you assigned to?

A. The Organized Crime Squad.

Q. Are you assigned to that particular squad for any reason?

A. The reason is, the F.B.I. and I take it the Justice Department too, has decided that the interstate transportation of obscene material is, at least in large measure, controlled by organized crime figures, which it is. (Tr. 11/28/79 at 12).

states that the prosecutor knew of Special Agent Livingston's problems shortly after the return of the first indictment in February of 1980. (Tr. at 284–5). In addition, the Court's attention was directed to the testimony of Special Agent Gordon G. McNeil, where he indicates that the prosecutor was told about Livingston's referral to Dr. Balasini before the second indictment. (Tr. at 576–7).

Based upon the above, the defendants claim it is conclusively established that the prosecution knew of Special Agent Livingston's problems prior to seeking the second indictment. Since Special Agent Livingston did not testify before the second grand jury but they were asked to consider his prior testimony, the defendants claim the prosecution had an ethical duty to inform the grand jury of evidence which undercut Special Agent Livingston's credibility. Therefore, the defendants contend that the grand jury was overreached and the prosecutor's misconduct usurped the grand jury's role.

▇ The historic role of the grand jury is to shield the innocent against arbitrary and unfounded charges and to determine if there is probable cause to believe a crime has been committed. *United States v. Calandra,* 414 U.S. 338, 342–343, 94 S.Ct. 613, 617, 38 L.Ed.2d 561 (1974); *United States v. Dionisio,* 410 U.S. 1, 16–17, 93 S.Ct. 764, 772, 35 L.Ed.2d 67; *Ealy v. Littlejohn,* 569 F.2d 219, 226 (5th Cir.1978).

In *Calandra* the Court stated:

The institution of the grand jury is deeply rooted in Anglo-American history. In England, the grand jury served for centuries both as a body of accusers sworn to discover and present for trial persons suspected of criminal wrongdoing and as a protector of citizens against arbitrary and oppressive governmental action . . .

414 U.S. at 342–343, 94 S.Ct. at 617. Moreover, and especially with regard to an obscenity case such as the one before this Court where there are delicate first amendment issues, the following language from *Wood v. Georgia,* 370 U.S. 375, 390, 82 S.Ct. 1364, 1373, 8 L.Ed.2d 569 (1962) is enlightening:

(It is) . . . important that freedom of communication be kept open and that the real issues not become obscured to the grand jury . . . . The necessity to society of an independent and informed grand jury becomes readily apparent in the context of the present case.

*Id.* at 390, 82 S.Ct. at 1373.[10]

▇ District Courts have inherent authority to dismiss indictments when the prosecutor has engaged in egregious misconduct or where the totality of the circumstances makes it clear that the grand jury process has been abused or subverted. In *United States v. Chanen,* 549 F.2d 1306 (9th Cir.1977), the Ninth Circuit Court of Appeals noted that:

On occasion, and in widely-varying factual contexts, federal courts have dismissed indictments because of the way in which the prosecution sought and secured the charges from the grand jury . . . . These dismissals have been based either on constitutional grounds or on the court's inherent supervisory powers . . . . Whatever the basis of the dismissal, however, the courts' goal has been the same, 'to protect the integrity of the judicial process,' . . . particularly the functions of the

10. In *Wood,* a county judge in the midst of a local political campaign issued a charge to the grand jury giving instructions to investigate accusations of alleged bloc voting by negroes and other rumors that political candidates used money to obtain the negro vote. A sheriff, who was a candidate for reelection, issued a press statement criticizing the judge and urging the citizens to take notice when their judges threaten and intimidate voters under the pretense of law enforcement.

The sheriff was charged with contempt and obstruction of the grand jury. The trial court found the sheriff guilty. The case went to the United States Supreme Court where it was held that the record does not support a finding that the sheriff's statements presented a clear and present danger to the administration of justice and that his conviction violated his right to freedom of speech pursuant to the first and fourteenth amendments. *Id.* at 395, 82 S.Ct. at 1375.

grand jury, from unfair or improper prosecutorial conduct. *Id.* at 1309.[11]

In *United States v. Samango,* 607 F.2d 877 (9th Cir.1979), the court affirmed a district court's dismissal of a superseding indictment. The court held that the manner in which the prosecutor obtained the indictment represented a serious threat to the integrity of the judicial process. Therefore, the court of appeals viewed the district court's dismissal of the indictment as "a proper exercise of its supervisory power." *Id.* at 885.

In *Samango,* one Dionisia Ferrer was indicted for drug smuggling. As part of a continuing investigation, Samango appeared before a grand jury that did not return an indictment. At the outset of Samango's first appearance, the prosecutor commented about his dissatisfaction with Samango's performance under a nonprosecution agreement. During the questioning of Samango, the prosecutor insinuated he was lying, they bickered at length and finally Samango asserted his Fifth Amendment privilege. *Id.* at 879.

A second grand jury reviewed transcripts of Samango's testimony before the first grand jury along with transcripts from related grand jury proceedings and received live testimony from other witnesses. The live testimony was basically monosyllabic affirmances or denials of the prosecutor's statements. The court characterized the indictment returned by this grand jury as an embarrassment.

While a hearing on a motion to dismiss the indictment was pending the prosecutor convened a third grand jury. He left an accumulated 1,000 pages of transcripts and a prepared superseding indictment with this grand jury. Also, testimony of one witness was presented. This testimony basically summarized the D.E.A.'s investigation. However, the witness was not involved with much of the investigation about which he testified. This third grand jury returned an identical indictment to the original. *Id.*

The Court found that the "cumulative effect of the above errors and indiscretions, none of which alone might have been enough to tip the scales, operated to the defendant's prejudice by producing a biased grand jury." Therefore, acknowledging that under its supervisory power a court may dismiss an indictment as a prophylactic tool for discouraging governmental impropriety, the court affirmed the district court's supervisory act of dismissing the indictment. *Id.* at 884.

Although this case lacks the scienter so prevalent in other cases, this Court finds that the reasons for dismissal are even more compelling than those in *Samango.* First there is the taint on the entire proceedings as a result of Special Agent Livingston's numerous and varied lies and indiscretions. Second, there is the problem of the extraneous and irrelevant evidence presented to the grand jury which in this Court's opinion may very well have interfered with their ability to concentrate on the delicate obscenity issues before them. Finally, there is the question of whether the prosecutor knew of Special Agent Livingston's problems before the second grand jury, and whether or to what extent Special Agent Livingston was experiencing psychological problems while testifying before the grand

---

11. In *Chanen,* a government agent read the grand jury transcripts of sworn testimony from a previous grand jury proceeding. The F.B.I. agent presented documentary evidence and responded to questions from jurors. The prosecutor advised the grand jury that witnesses had previously made statements inconsistent with their grand jury testimony and that the transcripts contained confessions of such witnesses.

The district court reasoned that since the government presented its case live before the first grand jury any subsequent grand jury should have the same opportunity to hear it live. Therefore, the district court dismissed the indictment. *Id.* at 1309.

The court of appeals reversed. The court held that the procedure used was not fundamentally unfair. The district court by dismissing the indictment exceeded its authority. According to the court of appeals, the district court did not have a clear basis in fact and law for encroaching on the prerogatives of the prosecutor. That is, what evidence to present to the grand jury and how to present it. *Id.* at 1313.

**1328**

jury in the late part of 1979 and early part of 1980 as evidenced by SAC Nehrbass' letter to Balasini in March of 1980. Certainly the cumulative effect of the above operated to the defendants' prejudice by producing a tainted if not biased grand jury.

■ The prosecution has a good faith duty to the Court, the grand jury and the defendant. *United States v. Basurto,* 497 F.2d 781, 786 (9th Cir.1974). In this regard, if the prosecutor has in his possession evidence which would cast doubt on the credibility of a witness before the grand jury, he has an ethical duty to disclose it. *See* 8 Moore's Federal Practice paragraph 6.03[2], at 6–61 (2d ed. 1978). However, in this case, the Court finds that the unusual turn of events referencing Special Agent Livingston may very well have produced an appearance of impropriety on the part of the prosecutor which in fact simply may not have existed. Although the Court finds no intentional misconduct on the part of the prosecution, the facts in this case establish that a false impression may very well have been created by the presentation of irrelevant prejudicial evidence to the grand jury and that in light of Special Agent Livingston's difficulties these proceedings have been tainted.

### III. SUPERVISORY POWER

Pursuant to its supervisory power over the criminal justice system, this Court hereby· dismisses the indictments in *United States v. DiBernardo, et al.,* Case No. 80–56–Cr–EPS (S1–S16). In the Court's opinion, the dismissal of the indictments in these cases is the legally correct remedy and is the remedy most consistent with fundamental fairness and due process.

■ With regard to the Government, it may appeal this Court's ruling dismissing the indictments, or it may seek new indictments based on those facts which are alleged in the superseding indictments. The question is whether a new grand jury fully advised of all the surrounding circumstances and unaffected by irrelevant and unrelated testimony would return the indictments sought by the Government. In the Court's opinion, the defendants are entitled to have the above question answered by a new grand jury.

■ The right to indictment by an unbiased grand jury is guaranteed by the Fifth Amendment. *Costello v. United States,* 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956). Proceedings before the grand jury are secret, ex-parte and for the most part under the exclusive control of the federal prosecutor. Because of concern for abuse inherent in grand jury proceedings, more and more courts are exercising their supervisory power over the administration of justice to regulate the manner in which grand jury investigations are conducted. *E.g. United States v. Gonsalves,* 691 F.2d 1310 (9th Cir.1982), (affirmed District Court's dismissal of an indictment because of inherent unmanageability of cumbersome indictment); *United States v. Samango,* 607 F.2d 877 (9th Cir.1979); *In Re Grand Jury Proceedings,* 486 F.2d 85 (3d Cir.1973) (Schofield I); *United States v. Jacobs,* 547 F.2d 772 (2d Cir.1976), *cert. dismissed,* 436 U.S. 31, 98 S.Ct. 1873, 56 L.Ed.2d 53 (1978).

The Court's supervisory power as an independent basis for decision was first used in *McNabb v. United States,* 318 U.S. 332, 340–47, 63 S.Ct. 608, 612–16, 87 L.Ed. 819 (1943). In *McNabb,* the Court traced the origin of the tainted evidence doctrine to the Supreme Court's supervisory power. *Id.* at 341, 63 S.Ct. at 613. Also, in *United States v. Mesarosh,* 352 U.S. at 14, 77 S.Ct. at 8, the Court used its supervisory power to reverse a judgment of conviction and grant the petitioner a new trial. Moreover, the inherent supervisory power has been invoked to do justice under the particular facts alleged. *United States v. Samango,* 607 F.2d at 884.

■ This supervisory power doctrine finds its origins in the complimentary principles of separation of powers and checks and balances. With regard to the above, the Court finds the following language from the recent *Gonsalves* case as helpful:

Separation of powers relies on the implementation of an 'intellectual distinction' among the three major functions of government to ... (prevent tyrannical use of power); accordingly the relevant case law is replete with assertions that the branches of government must be kept distinct and each must not interfere with the functioning of the others. In contrast, the doctrine of checks and balances buttresses the conceptual distinctions among the functions of government by providing for direct intervention by each branch into the functioning of the others; power can be checked only if it is shared ... For historical, pragmatic and conceptual reasons, American scholars have tended to favor a theory of constitutional balance over the theory of separation of powers.

*Gonsalves,* 691 F.2d at 1318 *citing* Nagel, *Separation of Powers and Scope of Federal Equitable Remedies,* 30 Stan.L.Rev. 661, 682 (1978). Therefore, as noted in *Gonsalves* the source of the Court's supervisory power can be traced to Article III of the United States Constitution, and pursuant to Article III the judicial branch may review the operations of the executive and legislative branches. *Gonsalves,* 691 F.2d at 1318 *citing Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803).

 The prosecutor in these Miporn cases is an arm of the executive branch of the government. In this capacity, "he is responsible to his principal and the courts have no power over the exercise of his discretion ...." *United States v. Chanen,* 549 F.2d 1306, 1313 n. 5 *citing Newman v. United States,* 382 F.2d 479, 481 (U.S.App. D.C., 1967). Therefore, the Court must be ever vigilant not to interfere with the constitutionally based independence of the executive.

In this regard, the following standard has been applied:

[G]iven the constitutionally-based independence of each of the three actors—court, prosecutor, and grand jury—we believe a court may not exercise its 'supervisory power' in a way which encroaches on the prerogatives of the other two unless there is a clear basis in fact and law for doing so. If the district courts were not required to meet such a standard, their 'supervisory power' could readily prove subversive of the doctrine of separation of powers.

549 F.2d at 1313. As heretofore noted throughout this opinion, both the facts and the law as applied herein amply support this Court's exercise of its supervisory power.

In this decision, the Court has attempted to present as best it can the true factual context within which it finds this case. Proceeding from that point, the Court's only concern is to reach the proper legal conclusion. That conclusion, in this Court's opinion, must be one most consistent with the concepts of fundamental fairness, due process and judicial integrity. With the above firmly in mind, in the interest of justice and pursuant to its supervisory powers, the Court does hereby

ORDER AND ADJUDGE that an order shall hereinafter be entered dismissing without prejudice each of the superseding indictments in *United States v. DiBernardo, et al.,* Case No. 80–56–Cr–EPS (S1–S16) and entering such other Orders as are appropriate in each case to dispose of all pending matters.[12]

---

**12.** The Orders of Dismissal contemplated in this opinion do not refer to cases 80–56–Cr–EPS (S3), (S12), (S14) and obviously (S9) (judgment of acquittal having heretofore been entered). As pertains to those cases the following action will hereinafter be taken by the Court: With regard to *United States v. Peraino, et al.,* 80–56–Cr–EPS (S3), the Court will issue a Rule to Show Cause why, even in light of the findings in this opinion, relief should be granted the Defendants as Special Agent Livingston did not testify at that trial; as pertains to *United States v. DiBernardo, et al.,* 80–56–Cr–EPS (S12), the Court will issue a Rule to Show Cause why under the circumstances of that case, Special Agent Livingston having testified, relief should not be granted; and finally with reference to *United States v. Bagnell,* 80–56–Cr–EPS (S14), defendant is granted 30 days by Order of this Court within which to file the appropriate Motion requesting the judgment and conviction heretofore entered be set aside.